## HURON PORTLAND CEMENT CO. v. WOODWORTH, Collector of Internal Revenue.

District Court, E. D. Michigan, S. D. May 28, 1921.

No. 7005.

1. Internal revenue ⬯11—Provision of 1917 Revenue Act imposing transportation tax applies to private as well as common carrier (Revenue Act 1917, §§ 500, 501 [Comp. St. §§ 6309⅛a, 6309⅛b]).

Revenue Act 1917, §§ 500, 501 (U. S. Comp. St. §§ 6309⅛a, 6309⅛b), imposing transportation tax, applies to private as well as common carriers.

2. Statutes ⬯211—Title of statute may be considered affecting construction of ambiguous provision.

In case of ambiguity in statute, resort may be had to its title as indicating correct interpretation.

3. Internal revenue ⬯11—Transportation company held subsidiary of cement company as affecting latter's liability for transportation tax (Revenue Act 1917, §§ 500, 501 [Comp. St. §§ 6309⅛a, 6309⅛b]; Revenue Act 1918, §§ 500, 501 [Comp. St. §§ 6309⅛a, 6309⅛b]).

Activities of transportation company subsidiary of cement company in operation of

single ship equipped especially for transportation of bulk cement *held* so inseparably linked with the business of parent company as to constitute one operation, as affecting liability of cement company for transportation tax under Revenue Act 1917 §§ 500, 501 (Comp. St. §§ 6309⅓a, 6309⅓b), Revenue Act 1918, §§ 500, 501 (Comp. St. §§ 6309⅓a, 6309⅓b).

4. **Internal revenue** ⊜⟶11—**Transportation company, operating single ship as subsidiary of cement company, held not "carrier for hire," as affecting cement company's liability for transportation tax (Revenue Act 1918, §§ 500, 501 [Comp. St. §§ 6309⅓a, 6309⅓b]).**

Transportation company, operating single ship as subsidiary of cement company, *held* not a "carrier for hire," as affecting cement company's liability for transportation tax, under Revenue Act 1918, §§ 500, 501 (Comp. St. §§ 6309⅓a, 6309⅓b).

5. **Estoppel** ⊜⟶62(2)—**Estoppel cannot be invoked against government.**

It is well settled that the doctrine of estoppel cannot be invoked against the government.

6. **Estoppel** ⊜⟶62(2)—**Government's acceptance of joint tax returns held not election to treat cement company and transportation company as one estopping assertion of claim against cement company for transportation tax (Revenue Act 1917, §§ 500, 501 [Comp. St. §§ 6309⅓a, 6309⅓b]; Revenue Act 1918, §§ 500, 501 [Comp. St. §§ 6309⅓a, 6309⅓b]).**

Government's acceptance of consolidated tax return from cement company and subsidiary transportation company *held* not an election to treat the two corporations as one, estopping the government from asserting that transportation company was independent and that cement company was liable for transportation taxes, under Revenue Act 1917, §§ 500, 501 (Comp. St. §§ 6309⅓a, 6309⅓b), and Revenue Act 1918, §§ 500, 501 (Comp. St. §§ 6309⅓a, 6309⅓b).

7. **Internal revenue** ⊜⟶11—**Agreement between cement company and subsidiary transportation company held not charter party or demise of boat as affecting liability for transportation tax. (Revenue Act 1917, §§ 500, 501 [Comp. St. §§ 6309⅓a, 6309⅓b]; Revenue Act 1918, §§ 500, 501 [Comp. St. §§ 6309⅓a, 6309⅓b]).**

Agreement between cement company and subsidiary transportation company, operating single ship especially equipped for transportation of bulk cement, *held* not a true charter party or demise of boat, as affecting liability of cement company for transportation tax, under Revenue Act 1917, §§ 500, 501 (Comp. St. §§ 6309⅓a, 6309⅓b), and Revenue Act 1918, §§ 500, 501 (Comp. St. §§ 6309⅓a, 6309⅓b).

At Law. Action by the Huron Portland Cement Company against Fred L. Woodworth, Collector of Internal Revenue. Judgment for plaintiff, for part only of recovery sought.

Beaumont, Smith & Harris, of Detroit, Mich., for plaintiff.

Delos G. Smith, U. S. Atty., of Detroit, Mich., and A. W. Gregg, Gen. Counsel Bureau of Internal Revenue and John R. Wheeler, Sp. Atty. Bureau of Internal Revenue, both of Washington, D. C., for defendant.

SIMONS, District Judge. Both parties having made requests for special findings of fact, the court upon a consideration of the evidence, does find:

(1) Plaintiff is a Michigan corporation engaged in the manufacture and sale of Portland cement.

(2) The Huron Transportation Company is also a Michigan corporation, with a capital stock of $10,000, organized to own and operate boats. Its original incorporators were the three principal stockholders of plaintiff's corporation, and plaintiff now owns all of the paid up stock of the Huron Portland Cement Company.

(3) Before the organization of the transportation company, the plaintiff had acquired the steamer Samuel Mitchell, paying therefor $55,000, and spending an additional $55,000 in refitting it. This sum was later defrayed from the proceeds of transportation company notes, guaranteed by plaintiff, and afterwards paid by it. No charge for interest on the notes has ever been made by plaintiff against the transportation company, and the transportation company has never paid dividends on its stock.

(4) The steamer Samuel Mitchell was refitted with special machinery and equipment to carry cement in bulk, cannot carry in quantity any other commodity, and has never carried in any substantial way any other commodity.

(5) Plaintiff's manufacturing plant is in Alpena, Mich., with docks and distributing plants at Duluth, Milwaukee, Detroit, Toledo, and Cleveland, equipped with special machinery for unloading bulk cement. There are no other cement plants or distributing plants on the Great Lakes equipped with such machinery for such purpose.

(6) Transportation company has never published or filed any tariff of rates, and has never complied, or been required to comply, with the laws of Michigan governing boats carrying freight for hire.

(7) After the organization of the transportation company, it entered into an agreement with the plaintiff which provided that the steamer Samuel Mitchell should be used exclusively to carry bulk cement for the plaintiff; that the entire expense of its operation should be borne by the plaintiff, setting up a charge per ton of cement handled, with the

provision that at the end of the year the entire cost of operating the steamer should be paid by plaintiff irrespective of the fixed charge or rate.

(8) Plaintiff's officers and employees have controlled the steamer's operation, purchased its supplies, designated points of delivery, and directed its repairs, and no charge has been made to the transportation company for such service.

(9) The steamer Samuel Mitchell had no regular trips, but carried bulk cement from plaintiff's Alpena plant to its subsidiary plants.

(10) The transportation company made an income tax return for 1917, reporting as gross sales money advanced and paid by the plaintiff to cover the steamer's costs, operations, and repairs. For the same year plaintiff and transportation company made a consolidated return of excess profits tax. Such consolidated return was made also in 1918, and each year thereafter, up to and including 1921, for the purpose of having income tax assessed, in each instance reporting as gross sales the amount of advances and expenses paid by the plaintiff on account of the operation of the transportation company's steamer.

(11) Beginning with 1916, the plaintiff has paid all of the expenses of the operation of the transportation company's steamer, regardless of the arbitrary charge provided in the agreement above referred to.

(12) For the period from November 1, 1917, to July, 1921, included, a transportation tax was assessed against the plaintiff in the sum of $10,361.45, to which a penalty was added in the sum of $429.90.

(13) The plaintiff duly filed its claim of abatement, and upon its being denied paid the taxes and penalty under protest. It duly filed its claim for refund, which was rejected, whereupon it began this suit.

### Opinion.

The tax sought to be recovered by the plaintiff in this proceeding was assessed for the period November, 1917, to April 1, 1919, under the provisions of sections 500 and 501 of the Revenue Act of 1917 (Comp. St. §§ 6309⅛a, 6309⅛b), and for the period from April, 1919, to July, 1921, under sections 500 and 501 of the Revenue Act of 1918 (Comp. St. §§ 6309⅓a, 6309⅓b). The contentions upon which plaintiff relies may be briefly stated as follows:

(1) The 1917 law applies only to public utilities or common carriers, and neither plaintiff, the transportation company, nor its steamer, was a public utility or common carrier.

(2) The 1918 law applies only on amounts paid for transportation to a carrier for hire. The transportation company's steamer was not a carrier for hire, but a plant facility for the plaintiff.

(3) The government having elected to treat the two corporations as one in respect to the consolidated income and excess profits tax returns cannot now be heard to say that they are separate.

(4) Plaintiff's agreement with the transportation company was an agreement for the demise of the boat, and as such the amounts plaintiff paid to the transportation company under the agreement are not taxable.

[1] 1. The 1917 act provides for a tax on the amount paid for transportation when in competition with carriers by rail or water of property by freight consigned from one point in the United States to another, and that the tax so assessed shall be paid by the person or corporation paying for the service or facility rendered. The act is not by its terms made applicable only to common carriers. The plaintiff's contention is that by implication it should be interpreted as so limited. The use of the descriptive term "carrier" in the applicable sections of the act certainly raises no implication that common carriers were meant. The law recognizes that there are common carriers, and that there are private or contract carriers, and it was certainly within the power of the Congress to tax transportation by either or both classes of carriers.

It is next urged that the statute is meant to refer to common carriers, because it provides that the tax be measured by the rate or tariff of carriers that publish rates or tariffs; that is, common carriers. It would seem that such implication as might be indicated by such language points to a conclusion directly opposite to the one contended for by the plaintiff. If transportation by common carriers only was meant to be taxed, there would have been no need to fix a measure of the amount to be taxed by a reference to those carriers that publish, or are required to publish tariffs. There is further urged in support of the plaintiff's view, that common carriers were intended by the 1917 act because the 1918 act in section 501, subdivision (c), uses the language: "The taxes imposed by section 500 shall apply to services or facilities specified in such section when rendered for hire, *whether or not the agency rendering them is a common carrier.*" There certainly can be no merit to this contention. It is just as logical to urge

that the 1917 act applied only to private carriers, and that by the language referred to in the 1918 statute, the Congress intended to extend the tax to common carriers. There is next relied upon the title to the chapter in which the material sections of the 1917 act are contained, as printed in Federal Statutes Annotated. The title is there given as "Facilities Furnished by Public Utilities and Insurance."

[2] Plaintiff contends that if there is any ambiguity in the meaning of the section, resort can be had to the titles for correct interpretation of the statute, citing Meischke-Smith v. Wardell (C. C. A.) 286 F. 785. There can be no quarrel with the rule thus urged, but plaintiff points out no ambiguity in the meaning of these sections, nor can I find any. The Wardell Case, supra, is not concerned with any ambiguity in the statute. If there is any holding in that case on the question of ambiguity necessary for decision, and I think there is none, because the case was decided upon other grounds, the holding is adverse to the plaintiff rather than in its favor. However it may sometimes seem to the layman otherwise, courts do not rewrite statutes. The act is clear in its terms, and nothing convincing is presented that would warrant the court in limiting the application of the tax therein provided for to a specific class of carriers where the statute makes no such classification, and where its meaning is obviously clear. Were any other consideration necessary to negative the fact of ambiguity in the statute, it would be necessary only to recall that in recent years the taxation, regulation, and control of common carriers has been the very anxious concern, both of the Congress and of the Legislatures of the several states. It would be idle to argue at this stage of the development of legislation in reference to common carriers that any legislative body, and particularly the Congress, would by inadvertence enact a statute in its terms applying to all carriers, when its intention was to apply such statute only to carriers of a given class.

[3, 4] 2. We come then to the application of the 1918 statute, which clearly, and the fact is not controverted by the defendant, makes the Transportation Act applicable only to carriers for hire, without regard to their classifications as private or as common carriers. It is argued by the plaintiff on various grounds that the transportation company is not such a carrier. Were decision to rest merely upon the fact that the plaintiff paid a rate for transportation determined by the cost of operating the transportation company's facility, or upon the fact that various employees and officers of the plaintiff's company devoted their time to the business of the transportation company without a charge being made by the plaintiff for such service, it would seem to me to be clear that the transportation company was a carrier for hire, whatever may have been the yardstick for the measurement of the cost of service supplied by the transportation company to the plaintiff.

To hold the transportation company a carrier for hire, however, and to sustain the validity of the tax under the 1918 statute, it would be necessary to base decision upon the one fact alone that the transportation company is a distinct corporation, and a separate entity from the plaintiff corporation. In all other respects it must be clear from the findings of fact, that the transportation company is a subsidiary of the plaintiff, owned and controlled by it, that its activities are completely linked with and wholly devoted to the plaintiff's business. Were the steamer Samuel Mitchell operated by the plaintiff, and had it not been turned over to a separate corporation, it would be equally clear under the facts of this case that the transportation of freight by it would not be subject to tax under the 1918 law, in view of the provisions of subdivision (c) of section 501, title 5, of the 1918 act, which distinguishes mere transportation of commodities from transportation for hire.

Does the fact that the plaintiff and the transportation company are under the law distinct corporations, and distinct legal entities, furnish the only necessary test as to the status of the transportation company as a carrier for hire? For answer to this query reference is made to two late decisions of the United States Supreme Court. Southern Pacific Co. v. Lowe, 247 U. S. 330, 38 S. Ct. 540, 62 L. Ed. 1142, and Gulf Oil Corporation v. Lewellyn, Collector, 248 U. S. 71, 39 S. Ct. 35, 63 L. Ed. 133. In the first case, the Southern Pacific was the lessee of property of the Central Pacific Railroad Company, and was the sole stockholder of the lessor corporation. It was in possession of a surplus belonging to the Central Pacific Railroad, accumulated prior to January 1, 1913, the effective date of the first income tax law. In 1914 dividends were declared out of the surplus of the lessor railroad, and the government sought to tax such dividends as being income of the Southern Pacific during the taxable year 1914. The court held the tax invalid, stating:

"While the two companies were separate legal entities, yet in fact and for all practical purposes they were merged, the former being

but a part of the latter, acting merely as its agent and subject in all things to its proper direction and control. And, besides, the funds represented by the dividends were in the actual possession and control of the Southern Pacific as well before as after the declaration of the dividends. The fact that the books were kept in accordance with the provisions of the lease, so that these funds appeared upon the accounts as an indebtedness of the lessee to the lessor, cannot be controlling, in view of the practical identity between lessor and lessee."

It is not enough to say in answer to this holding that the Southern Pacific Case involved the application of the Income Tax Law, while the instant case concerns itself with the application of a specific tax on transportation. If the two companies were in all respects separate entities, and were unrelated companies, the fact that the dividends of one company were received by another during the taxable year would be controlling regardless of the time when such dividends were earned by the declaring corporation. It must be clear, therefore, from this decision, that the fact of there being two separate corporations is not the sole test, but that the court will look through the form of the organization to the actual operation, and determine whether or not the subsidiary corporation was so owned and controlled, and to such an extent a part of the operations of the principal corporation that its activities were in fact the activities of the principal corporation.

Did the Southern Pacific Case, however, stand alone, argument might be advanced distinguishing the facts in that case from the instant case in several respects. The Southern Pacific was in actual possession and control of the property of the Central Pacific Railroad, the subsidiary corporation, and the money declared as dividends was in possession of the Southern Pacific. I am inclined to think that the relation between the plaintiff corporation and the transportation company was not so identical a relation as that which existed in the Southern Pacific Case.

Gulf Oil Corporation v. Lewellyn, supra, removes all doubt, however, of the nature of the precedent set by the Southern Pacific Case. In the Gulf Oil Corporation Case, the principal corporation did not itself do the business of its subsidiaries, nor have possession of their property, yet the court held that the principle of the Southern Pacific Case must be taken to cover the situation therein disclosed. The court said:

"It is true that the petitioner and its subsidiaries were distinct beings in contempla-tion of law, but the fact that they were related as parts of one enterprise, all owned by the petitioner, that the debts were all enterprise debts due to members, and that the dividends represented earnings that had been made in former years, and that practically had been converted into capital, unite to convince us that the transactions should be regarded as bookkeeping rather than as dividends declared and paid in the ordinary course by a corporation."

It follows from this discussion that my conclusion must be that, while the 1917 statute taxed all transportation, whether by common or private carriers, or by the owner of the goods transported, and that the tax levied under that statute is valid; that the 1918 statute was applicable only to transportation for hire, and that the transportation company, even though a corporation distinct from the plaintiff corporation, was a subsidiary of the plaintiff, and that its activities in transportation were so inseparably linked with the business of the plaintiff company that they constituted one operation, and that the transportation done by it was therefore in fact plaintiff's transportation, and not a transportation for hire. The tax levied and assessed, therefore, against the plaintiff under the 1918 statute, must be declared invalid.

[5, 6] 3. In view of the above, the contention that the government having elected to treat the two corporations as one in respect to consolidated income and excess profits tax returns, and cannot now be heard to say that they are separate, becomes of no importance, except as it may relate to the taxes assessed under the 1917 statute. I know of no rule upon which this contention can be sustained, except that of equitable estoppel, and it is settled that such estoppel cannot be invoked against the Government.

[7] 4. Were the plaintiff and the transportation company unrelated corporations, it seems to me equally clear that the agreement between them in reference to the transportation of the plaintiff's commodities, would be neither a true charter party nor an agreement for the demise of the boat. This contention, of course, is also of importance only in relation to the tax held valid under the 1917 law, and in so far as it applies to such tax it seems to me unsound.

Judgment will be entered in favor of the plaintiff, and as against the defendant, for those taxes levied and assessed against the plaintiff and by it paid for the period between April, 1919, and July, 1921. The amount, as I am at present advised, consists of the sum of $3,000.28 for the period April to Decem-

ber, 1919, the sum of $3,656.68 for the period April to December, 1920, and the sum of $1,-941 for the period April to July, 1921. The judgment will also include such portion of the assessed penalty as was paid by reason of the delay and failure of the plaintiff to seasonably pay the amounts set forth, and to all such sums will be added interest from the date they were actually paid to the government to the date of final judgment, at the rate of 6 per cent. per annum.