APPEALS OF R. W. WISTAR, F. S. UNDERHILL, AND T. N. NIXON.

Docket Nos. 2388, 2251. Submitted May 12, 1925. Decided October 28, 1925.

1. Members of a partnership which during the years 1919 and 1920 owned all of the stock of a corporation operated for all practical purposes as a branch or agency of such partnership, were not entitled to deduct proportionately in their individual income-tax returns for 1919 and 1920 the losses sustained by such corporation.

2. The amount of profits tax originally paid by a partnership for the year 1917 and deducted proportionately by the partners was properly restored to their individual income by the Commissioner.

*W. B. Riter, Esq.*, for the taxpayers.
*P. S. Crewe, Esq.*, for the Commissioner.

Before JAMES, LITTLETON, SMITH, and TRUSSELL.

payers in their returns for the years 1919 and 1920 on account of losses sustained by the Penn-Sumpter Lumber Co., a corporation. The appeals were consolidated and heard together.

### FINDINGS OF FACT.

1. Wistar, Underhill & Nixon is, and at all times hereinafter mentioned was, a copartnership composed of R. W. Wistar, F. S. Underhill, and T. N. Nixon, each of whom had an equal interest therein and in the income derived therefrom. It was engaged in the sale of lumber, with its office and principal place of business at Philadelphia. Its books were kept on the basis of a fiscal year ending January 31. The individual members of the partnership kept their books and reported for income-tax purposes on the calendar-year basis. The three individual members made yearly returns to the collector of internal revenue for the calendar years 1919 and 1920 of their income received during those years, and in so doing each claimed a deduction of one-third of the losses claimed to have been sustained by the partnership on account of the operations of the Penn Sumpter Lumber Co., a corporation of South Carolina, and the ownership by the partnership of its shares of stock, under the circumstances hereinafter set forth.

2. The corporation was organized under the laws of South Carolina several years prior to 1919 and remained in existence from the date of its organization until 1924. Its books were kept on the calendar-year basis. It was capitalized for $30,000, represented by 300 shares of the par value of $100 per share, all of which were issued and outstanding during the years 1919 and 1920. Slightly more than two-thirds of the outstanding shares of stock in the corporation were owned by the partnership at all times from January 1, 1919, up to December, 1919, the remaining shares being owned by about four or five individuals who were in no wise connected with the partnership. In December, 1919, these remaining shares were acquired by the partnership from the individuals just mentioned without the payment of any consideration whatever, and from the date of such acquisition until the end of the year 1920, and thereafter, the partnership owned all of the shares of stock of the corporation. One share was, however, issued, without consideration, to the wife of one of the partners and another share was likewise issued to the resident superintendent of the corporation, solely for the purpose of enabling them to serve as officers, the real and beneficial ownership of these shares being at all times vested in the partnership.

3. Practically all of the assets of the corporation consisted of stumpage lands located in South Carolina and the necessary facilities to

convert the trees thereon into timber. Under arrangements entered into with the fee owners, the corporation enjoyed the right of cutting and removing the trees on these lands within a designated time. Among its assets were a mill and other facilities which it employed for the conversion of the trees, when cut, into timber. The activities of the corporation were confined to the manufacture into lumber of the trees from these stumpage lands, and the sale of such lumber in the manner hereinafter set forth.

4. The corporation was at all times during 1919 and 1920 under the complete domination and control of the partnership. It had no selling agency of its own, and practically all of the lumber which it manufactured and produced was sold to the partnership at prices which the latter dictated and determined. The partnership in carrying on its business of selling lumber would quote to a prospective purchaser the price at which it was willing to sell lumber, and, on obtaining from such prospective purchaser an order to buy, the partnership would then direct the corporation to sell such lumber to it at the price which the partnership had quoted to its customer, and would give the corporation instructions to ship the lumber either to the partnership or to its designated consignee. The corporation would comply with such instructions and would ship the lumber as directed, rendering its bill therefor to the partnership at the price thus dictated by the latter. Practically all of the lumber thus manufactured and produced by the corporation was shipped and billed in the manner aforesaid, although small and negligible portions were sold from time to time to local buyers; but even as to these sales the prices were determined by the partnership. One of the members of the partnership devoted substantially half of his time to supervising and directing the affairs of the corporation at the place where its activities were carried on, without, however, receiving any salary or compensation therefor. Throughout 1919 and 1920 he was the president and one of the directors of the corporation, and the other members of the partnership were also officers and directors of the corporation, serving as such without salary. The only official of the corporation who drew any salary was its superintendent, and he was one of its directors. The superintendent was under the supervision and control of the president and did as the latter directed.

5. Substantially all of the corporation's income was derived from the sale of the lumber to the partnership as aforesaid. Its income was, however, insufficient to enable it to meet its current expenses, and it accordingly became necessary for the partnership to make advances to the corporation each month throughout 1919 and 1920, so as to provide the latter with necessary funds to meet its pay roll and other current expenses. The partnership thus advanced to the

corporation in the year 1919 the total sum of $225,910.81. During the same year the corporation sold lumber to the partnership, in the manner above described, in the aggregate sum of $156,777.40, the partnership being charged on the lumber thus sold against the advances thus made; the excess of advances over charges being $69,133.41. The partnership likewise advanced to the corporation in the year 1920 the total sum of $342,211.70. During the same year the corporation sold lumber to the partnership, in the manner above described, in the aggregate sum of $184,835.52, the partnership being charged on the lumber thus sold against the advances thus made, the excess of advances over the sales charged being $157,376.18. No one else made advances to the corporation to enable it to meet its current expenses, not even during the period in 1919 when some of the shares of stock of the corporation were owned, as hereinbefore set forth, by others not connected with the partnership. The corporation was unable to borrow any money from the banks unless the partnership guaranteed the notes, which it did from time to time. In the year 1919, the corporation sustained a net loss of $46,756.47, and in the year 1920 a net loss of $69,455.59. In 1924 the corporation was wound up and dissolved, but the moneys advanced by the partnership as aforesaid have never been paid back nor have the losses sustained in making such advances been otherwise recovered.

6. The activities of the corporation during the years 1919 and 1920 were so conducted as to cause it, in practical effect, to lose its corporate identity and to become but a mere branch or department of the partnership. It had no independent corporate existence in the same sense that it carried on its corporate activities separate and apart from the partnership, but acted in subordination to the partnership as a means of enabling the latter to carry on its business activities. In order for the partnership to function it was necessary to procure lumber from available sources to supply the wants of its customers. The corporation was utilized by it merely as an instrumental agency of its own to supply it with lumber in order to fill the orders of its customers, the partnership thus procuring its necessary lumber sometimes from the corporation and sometimes from independent sources, although mostly from the latter. The corporation, as above recited, sold its lumber without exercising any independent volition of its own as to the prices it should charge, but followed at all times the instructions given it by the partnership as to the prices it should charge the latter and as to the places and persons to whom the lumber should be shipped.

7. The individual members of the partnership in making their income-tax returns for 1919 claimed, as allowable deductions, their

proportionate share of the net loss thus sustained by the corporation in that year, which they at that time computed to be $41,994.75; that is to say, each claimed a deduction of one-third of this sum, such one-third amounting to $13,987.25. Likewise, the individual members of the partnership in making their income-tax returns for 1920 claimed, as allowable deductions, their proportionate share of the net loss sustained by the corporation in that year, which they at that time computed to be $96,613.95; that is to say, each claimed a deduction of one-third of this sum, such one-third amounting to $32,204.65. Such losses were, however, disallowed by the Commissioner in his determination that a tax deficiency exists, as hereinafter set forth.

8. The partnership, in making its return of profits distributable to the partners for its fiscal year ended January 31, 1919, deducted from gross income the amount of $5,722.87, which represented the excess profits tax imposed by law on the partnership during that portion of the calendar year 1917 falling within its previous fiscal year ended January 31, 1918, such tax being paid by the partnership during its fiscal year ended January 31, 1919. The partnership later filed with the Commissioner a claim for refund of a portion of such tax on the theory that the partnership had erroneously computed the amount; and the Commissioner, on December 22, 1924, found that the true amount of such tax was $4,806.67, and ordered a refund of such part of the tax in excess of the latter amount as was included in the claim for refund. The Commissioner, on examining the partnership return for the fiscal year ended January 31, 1919, disallowed the aforesaid deduction of $5,722.87, restored the same to income and increased each partner's distributive share of the taxable profits accordingly. The taxpayers on the hearing of this appeal admitted that the Commissioner, in determining the income of the partnership for its fiscal year ended January 31, 1919, was right in disallowing the excess profits tax paid by the partnership as aforesaid, but claimed that inasmuch as he had, on December 22, 1924, computed the true amount thereof to be $4,806.67 instead of $5,722.87, he should have restored to partnership income the smaller amount and not the larger.

9. The Commissioner, upon audit of the returns of T. N. Nixon, R. W. Wistar, and F. S. Underhill, disallowed the deductions taken by them for the years 1919 and 1920 on account of losses sustained by the Penn Sumpter Lumber Co., and adjusted their distributive shares of the income of the partnership of Wistar, Underhill & Nixon, as hereinabove set forth, and determined that as to Nixon there was a deficiency in tax for the year 1919 in the amount of $2,629.58; that as to R. W. Wistar there was a deficiency in tax in the amount of $3,053.19 for the year 1919, and in the amount of

$9,635.79 for the year 1920; and that as to Underhill there was a deficiency in tax in the amount of $3,166.01 for the year 1919, and in the amount of $8,343.14 for the year 1920.

DECISION.

The determination of the Commissioner is approved.

OPINION.

LITTLETON: The taxpayers in this appeal concede that, under the law, the partnership of Wistar, Underhill & Nixon and the Penn Sumpter Lumber Co. were not and could not have been affiliated during the years 1919 and 1920, but they contend that, notwithstanding that fact, the members of the partnership were, under the doctrine announced by the Supreme Court of the United States in *Southern Pacific Co.* v. *Lowe*, 247 U. S. 330, entitled to deduct from gross income in their individual returns, according to their interests in the partnership, the losses sustained by the corporation during the years involved herein. They also contend that the Commissioner erred in adding to the net income of the partnership for the fiscal year ended January 31, 1919, the amount of $5,722.87, which had been deducted on its return on account of excess profits tax paid in that year for the fiscal year ended July 31, 1918; that he should have added only $4,806.67, the amount of excess profits tax which was finally determined to be due for the fiscal year ended January 31, 1918.

It is obvious from the foregoing that while the taxpayers expressly disclaim affiliation in name between the partnership and the corporation, they contend for affiliation in fact, since the result sought to be obtained is exactly that which would follow if affiliation were permitted. We can not agree with the taxpayer that the decision in *Southern Pacific Co.* v. *Lowe, supra*, is controlling or even in point here. That was a case involving two corporations, creatures of the same genus and merged in fact into a single entity. Furthermore, the point involved there was whether certain dividends declared by the Central Pacific Railway Co. in the year 1914, out of surplus accumulated prior to March 1, 1913, were taxable, the money out of which the dividends purported to have been paid having actually been, prior to March 1, 1913, in the possession of the Southern Pacific Co. which owned all of the capital stock of the Central Pacific Railway Co., and they being represented by mere bookkeeping entries designed to bring the books of the two companies in accord

with the facts as they theretofore existed. The court held that the surplus accrued on the books of the Central Pacific Railway Co. prior to March 1, 1913, accrued to the Southern Pacific Co. prior to that date in every substantial sense and that the dividends were, therefore, not subject to tax. That case is entirely different from the instant appeals. Here we have a corporation and a partnership, one a legal entity, the other an association of individuals or entities. Under the Revenue Act of 1918, which was in effect during the years 1919 and 1920, affiliation or the merging of taxpayers for the purposes of taxation was required only in the case of two or more corporations, where certain conditions of ownership or control of stock existed, and it did not extend to any other class of taxpayers. We are convinced that the Commissioner could not legally require the merger of a partnership and a corporation for the purposes of taxation; and that which can not be required may not be permitted. These appeals are identical in principle with the *Appeal of Winthrop Ames*, 1 B. T. A. 63. In that appeal the Board held that—

A taxpayer owning all of the stock of a corporation, not a personal service corporation, may not deduct under the Revenue Act of 1918, as losses sustained in the business or as debts ascertained to be worthless, advances made to such corporation in the amount of the losses actually sustained by the corporation during a year so long as the corporation has net assets from which recovery in part is possible.

It follows that the action of the Commissioner in refusing to permit the taxpayers to deduct from gross income on their individual returns the losses sustained by the Penn Sumpter Lumber Co. during the years 1919 and 1920 must be approved.

With respect to the second question presented, the evidence establishes that the partnership of Wistar, Underhill & Nixon paid during the fiscal year ended January 31, 1919, the amount of $5,722.87 on account of excess profits tax due for the fiscal year ended January 31, 1918, and deducted that amount from gross income. The Commissioner disallowed the deduction and increased the taxpayers' net income as reported by the amount of the deduction. Subsequently it was determined that the correct amount of excess profits tax due from the partnership for the fiscal year ended January 31, 1918, was $4,806.67, and the excess of the amount paid over the amount that should have been paid was refunded to the partnership. The taxpayers contend that the Commissioner should have increased the partnership's net income only by the amount of tax finally determined to be due.

We are of the opinion that the taxpayers are clearly in error. The partnership was not entitled to deduct on its return for the fiscal year ended January 31, 1919, any amount on account of excess profits tax paid in that year for the fiscal year ended January 31, 1918. Whether or not the amount deducted was the correct amount of tax due for the fiscal year ended January 31, 1918, makes no difference here. The partnership's income on its return was erroneously decreased by the amount of the deduction taken and it was the duty of the Commissioner to disallow the entire deduction and increase the partnership income by the amount thereof, regardless of the amount of tax actually paid or that might thereafter be determined to be due.